Ellis J. HAMPTON and Arkansas-Best Freight System, Inc., an Arkansas corporation, Plaintiffs-Appellants,

v.

Charles E. RAINES and Melvin J. Ellis, Defendants-Respondents.

No. 7841.

Springfield Court of Appeals.

Missouri.

March 3, 1960.

Motions for Rehearing and to transfer overruled April 19, 1960.

George M. Flanigan, McReynolds, Flanigan & Flanigan, Carthage, Harper, Harper & Young, Fort Smith, Ark., for plaintiffs-appellants.

Karl W. Blanchard, Seiler, Blanchard & Van Fleet, Joplin, for defendants-respondents.

RUARK, Judge.

As an after-product of a head-on collision between two tractor-trailer outfits, we are presented with a question of humanitarian negligence on the theory of "failure to cease blinding."

The collision occurred at approximately 4:30 in the morning in a fairly heavy fog. It happened in the east (northbound) lane of Highway 71 just south of Jasper, Missouri. The road at that point is two-lane asphalt, approximately 24 feet wide. A few hundred feet to the south of the scene of collision there is a fairly abrupt double curve. From there on north, at the scene of the collision and a considerable distance beyond, the road runs straight and level.

We can hardly give a complete picture of the occurrence without relating the substance of what the parties, who were the only witnesses to the actual collision, said. Plaintiff Hampton, who came from the south, was driving a tractor pulling a box trailer heavily loaded with paper. He says he came around the curve prior to the collision at about 30–35 mph and that he had been running, and continued to run, with his lights on "low beam" and with his fog lights (mounted under the front bumper) turned on. His tractor-trailer carried small overhead clearance lights. After he rounded the curve he noticed the lights of defendant Ellis' vehicle approaching from the north, then some 700–800 feet away, and when they were about 400–500 feet in front of him he could tell they started across to his lane of traffic. He ran his arm through the horn cord and began to blow his horn, applied his brakes, pulled to the right as far as he could, and began flicking his fog lights. The shoulder was approximately 3 feet wide, and ahead of Hampton and near the scene of collision was a rather deep culvert, the edge of which was 3 feet 3 inches from the right edge of the pavement. At the last instant, just before the impact, he pulled his tractor sharply to the left in order to avoid a head-on collision, so that at the time of the impact the left front wheel of his tractor was "slightly" over the center line of the pavement although his trailer was still directly north and south. The highway patrolman, who appeared on the scene shortly, testified that skid marks extended from the rear dual wheels of the tractor back (south) a distance of 145 feet. The picture exhibits show these marks to be well over to the right and near the extreme east side of Hampton's northbound lane. The right front headlight of the Hampton truck was smashed. The patrolman said that the one remaining light was of "normal" brightness, but because the collision had bent it downward he could not

say whether it was on high beam or low beam.

Ellis, the defendant, the southbound party, was driving a tractor pulling a large empty stock trailer. He had his fog lights burning. He saw the lights of Hampton's tractor when he was 600–700 feet away. He was then driving 30–35 mph. It "seemed like" 30 mph. At 500 feet he was completely blinded by Hampton's lights. He tried to hold the wheel straight and did not attempt to turn to the right or left. He began blowing his horn and blinking his lights. As to just where, in relation to the point of impact, he began this blinking of lights will be discussed in more detail hereinafter. He said that his vehicle had slowed to about 20 mph at the time of the collision, but as to just what effort, if any, he had made to brake his vehicle to a stop the record does not show. At one point in his testimony, in explaining that a vehicle will "wander" to one side or the other even though the wheel is not voluntarily turned by the driver, he said, "It is not possible you can coast along straight down the road." He said he never saw Hampton's fog lights; that had he been able to see his position on the road he could have turned to his own (right) side of the road within a distance equal to the length of his outfit, which was some 45 feet long.

The case was tried to the jury largely on the question of "high beam or low beam." Defendant Ellis contended that had Hampton dimmed his lights he, Ellis, could have located himself on the road, turned aside, and thereby prevented the collision. Hampton, on the other hand, contended that he at all times had his lights on low beam. The trial resulted in a six-woman-three-man jury verdict for defendants on both plaintiffs' claim and defendants' counterclaim. Plaintiffs have appealed, and because of the juxtaposition of the parties we will refer to them hereafter by name.

The case is not presented to us upon any complaint of error in refusing to direct a verdict for plaintiffs. Four assignments are made. Two of them are in respect to the giving of instructions; one complains of error in the refusal to permit amendment of pleadings; and the remaining one deals with alleged error in respect to argument of counsel. The parties devote most of their attention to several alleged errors in the giving of defendants' instruction number 4, which is as follows:

"With respect to the counterclaims of the defendants against the plaintiffs, the court instructs the jury that if you find from the evidence that at the time and place and before the collision defendant Melvin Ellis was blinded by the lights of plaintiffs' truck and was on the wrong side of the highway and in a position of imminent peril of being struck and injured by plaintiffs' truck, and if you further find from the evidence that plaintiff Hampton saw, or by the exercise of the highest degree of care could have seen defendant Ellis in such position of imminent peril in time thereafter by the exercise of the highest degree of care, with the means and appliances at hand, with reasonable safety to himself, his vehicle and others using the highway to have ceased blinding defendant Ellis (if so) and *to have given defendant Ellis warning by dimming or lowering the beam of his headlights in time thereafter for defendant Ellis to have discovered his position on the wrong side of the highway and to have turned his vehicle back* onto the right or west side of the center line of the highway and that had plaintiff Hampton so dimmed or lowered his lights defendant Ellis could and would have returned to the west side of the center line and by so doing the collision could have been avoided;

"And if you further find from the evidence that plaintiff Hampton failed to exercise such care to cease blinding defendant Ellis (if so) and to give

defendant Ellis such warning and that such failure of plaintiff Hampton was the direct and proximate cause of the collision and that defendant Ellis was thereby injured and defendant Raines' truck damaged, then you are instructed that you must return a verdict for the defendants on their respective counterclaims and against the plaintiffs jointly, and this is true even though you find from the evidence that defendant Ellis was negligent in getting himself and his truck in such position of imminent peril on the wrong side of the highway."

The first attack upon this instruction is that it does not hypothesize Ellis' obliviousness. While obliviousness of the injured party has been said to be an essential element in many failure to warn cases,[1] nevertheless it has been held to be but a "subsidiary evidentiary fact" and need not be hypothesized in an instruction. Perkins v. Terminal R. Ass'n of St. Louis, 340 Mo. 868, 102 S.W.2d 915; Harrow v. Kansas City Public Service Co., Mo., 233 S.W.2d 644; Donahoo v. Illinois Terminal R. Co., Mo., 300 S.W.2d 461, 466; Scott v. Terminal R. Ass'n of St. Louis, Mo.App., 86 S.W.2d 116.

Moreover, we think Ellis was not oblivious in the sense intended by the humanitarian doctrine. He knew that his vehicle was approaching another vehicle upon a two-lane highway, the principal width of which would soon be consumed by the two vehicles. He was an experienced truck driver. He knew that his vehicle might "wander" even though he did not turn the wheel. He knew that if the two vehicles continued their approximate courses a collision was not only possible but highly probable. He may not have known which side of the road he was on, but he knew he was in danger of collision and he knew *why* he was in danger. He was in this respect like a man who has fallen into a pen of wild bulls. He may not be sure that he will be gored, nor, if so, which bull will gore him, nor, if so, from which side the goring will come; but he is not oblivious to the fact that he is in danger of being gored. It seems to us that if defendants' case is to be sustained it must be upon the principle that Ellis became in a position of peril by virtue of being trapped, in this case trapped by blinding lights, and that he could not escape by turning aside until Hampton released that trap by dimming his lights.[2] We think Ellis was not oblivious, but in the peculiar factual situation we have there are some analogies which may be drawn from those cases involving "fixed purpose" inattention or obliviousness, in assessing Hampton's duty to discover the cause and apply the remedy for the peril. And we think there might remain the question of whether Ellis, being aware of his danger and not incompetent, was actually not in imminent and inextricable peril so long as he had the time and ability (if he did) to avoid the collision by braking his vehicle to a stop, and also whether his position on the road under these circumstances carried the "reasonable appearance" of such peril until it was too late to avoid the collision.[3]

Another attack upon the instruction is that (a) there was no substantial evidence to support the fact that Hampton knew or should have known that Ellis was blinded, and (b) it contained no hypothesis or re-

1. Beckwith v. Standard Oil Co., Mo., 281 S.W.2d 852, 856; Vietmeier v. Voss, Mo., 246 S.W.2d 785, 788; Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S.W.2d 368; Knorp v. Thompson, 352 Mo. 44, 175 S.W.2d 889; Pentecost v. St. Louis Merchants' Bridge Terminal R. Co., 334 Mo. 572, 66 S.W.2d 533; Lefkowitz v. Kansas City Public Service Co., Mo., 242 S.W.2d 530; Marczuk v. St. Louis Public Service Co., 355 Mo. 536, 196 S.W.2d 1000; compare Rentfrow v. Thompson, 348 Mo. 970, 156 S.W. 2d 700; George v. Allen, 362 Mo. 971, 245 S.W.2d 848, 851.

2. As to blinding lights generally, see Fuller v. Baxter, Mo.App., 284 S.W.2d 66.

3. See 20 Mo.Law Review 38 (Becker) as to classifications of peril, and annotation at 47 A.L.R.2d 16, et seq.

quirement of finding that Hampton knew or should have known Ellis was blinded.

▮ We think a necessary element of defendants' case is that Hampton knew or should have known that Ellis was blinded. One of the essential, basic, fundamental elements of the last chance-humanitarian doctrine is that the person to be charged knew or should have known of the danger.[4] And (drawing an analogy from cases of "fixed purpose" inattention or obliviousness) the application of the question is whether and when the "reasonable appearances" of the situation required the plaintiff to discard the assumption that defendant would take apparently available steps for his own safety and act to prevent the injury which would result if he continued in his then course.[5]

▮ The grandfather case of Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482, which outlined the constituent elements of humanitarian negligence, was careful to point out (loc. cit. 484) that the rules governing the doctrine were "stated in their simplest terms, without any of the refinements, limitations, or exceptions *which might arise on a particular state of facts.*" (Our emphasis.) In every humanitarian negligence case the governing principle of law must be arrived at with reference to the basic factual stiuation presented. State ex rel. Baldwin v. Shain, Mo., 125 S.W.2d 41, 44. The basic factual predicate of liability in this case is the responsibility of Hampton to act to alleviate one certain, definite condition—that of blindness. True, Ellis was in peril, by being on the wrong side of the road. There is no dispute as to that. Hampton had reacted to that peril

by attempting to use and apply the conventional methods of avoiding collision. He was attempting to stop his vehicle on the extreme right side of the road. There is no contention that he did not do all he could in that respect. The theory of this case is that he should have done yet another certain, definite thing, i. e., lower his lights. The basis of the need for lowering the lights was that Ellis was blinded. The cause and effect, the lights and the blindness, merge into one particular "peril" which Hampton is charged with failure to remedy. Hampton does not admit that he *knew* Ellis was blinded. In fact, he does not admit that he had his "blinding" lights on. Nor do we find any place in the record where he admits that he ever saw the blinking of Ellis' lights. Therefore, Ellis must show, and such is his burden, facts and circumstances from which the jury could find (and how could they find it except by inference?) that Hampton *should* have known that Ellis was blinded to the extent that he did not know where he was on the road and thus could be expected to continue on the wrong side. Whether or not the *being* on the left side of the road and the blinking of lights on a foggy night would justify the inference that Hampton knew or should have known that the blinking of lights under all the circumstances carried the message, "I am blinded so that I cannot see which side of the road I am on and turn aside," which Hampton was bound to interpret correctly and act upon, is in our opinion a doubtful question. But for the purpose of this opinion we will assume that the blinking of lights carried such a message and that Hampton, as a highly careful person, should have made that correct interpretation.

---

4. See compilation of West's Missouri Digest, Negligence ▮ 83.7.

5. Moore v. Middlewest Freightways, Inc., Mo., 266 S.W.2d 578, 582; Knorp v. Thompson, 352 Mo. 44, 175 S.W.2d 889; Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S.W.2d 368; Camp v. Kurn, 235 Mo.App. 109, 142 S.W.2d 772; Poague v. Kurn, 346 Mo. 153, 140 S.W.

2d 13; Lefkowitz v. Kansas City Public Service Co., Mo., 242 S.W.2d 530; Roberts v. Chicago, B. & Q. R. Co., Mo.App., 266 S.W.2d 38, 43; Shepherd v. Chicago, R. I. & P. Ry. Co., 335 Mo. 606, 72 S.W.2d 985, 987; Myers v. Karchmer, Mo., 313 S.W.2d 697, 704; Frandeka v. St. Louis Public Service Co., Mo., 234 S.W.2d 540, 547.

But that is not enough. In order for Hampton to be liable the message must have been sent and received in time for Hampton to correctly decode it, and thereafter to act upon it, and for Ellis to have yet thereafter turned aside and so avoid the collision. Hampton cannot be charged with last chance or humanitarian negligence unless there was time for him to act *and time thereafter for his acts to have effect,* after he knew or should have known of the condition of peril which he was required to alleviate.[6] And this cannot be a matter of speculation or surmise.[7]

Now let us look at Ellis' testimony. Just *how far apart* were the vehicles when he sent out his message? He testified that after he was blinded "the first thing I did I started working my double switch, working my light up and down to get him to lower his light so it wouldn't blind me." But *where was he* and how far had he gone and how far apart were the vehicles when he did this "first thing"? Was he then 400 feet up the road? Or was he so close that he could no longer turn aside? What did the witness mean by such testimony? We look at his previous testimony:

"A. I honked my horn and blinked my lights. You know, blinking my lights, come blinking my lights.

"Q. How far was your truck from the point of impact when you did that? A. I don't know. I couldn't tell you . that.

"Q. Was it five feet? A. I don't know.

"Q. Was it one hundred feet? A. I don't know that. I couldn't tell you that.

"Q. Was it five hundred feet? A. I don't know. I couldn't tell you that.

"Q. One thousand feet? A. I couldn't tell you that.

"Q. Five miles? A. I don't know how far it was. I just don't."

█ Where there is *no contradiction* the testimony of a witness must be considered as a whole. 32 C.J.S. Evidence § 1031a, p. 1073; Batson v. Ormsbee, Mo.App., 304 S.W.2d 680, 682; Dimond v. Terminal R. Ass'n of St. Louis, 346 Mo. 333, 141 S.W. 2d 789, 799; Dugan v. Rippee, Mo.App., 278 S.W.2d 812. For sometimes the meaning of the words or the thought attempted to be conveyed by the witness may be explained and clarified in the words he used or by what he previously said in relation to the same subject. Of course, prior statements of a witness do not destroy the prima facie probative effect of the contrary testimony of the witness at the trial.[8] But we see no contradiction in the two statements of the witness and we see no reason why his previous testimony should not be considered if it will shed light on what he actually meant by the expression "the first thing I did"; for if he meant it to convey the sense of "immediately," then the statement "the first thing I did" should be interpreted as a statement that he commenced blinking his lights a short time after he was blinded and while the vehicles were yet a considerable, although undetermined, distance apart. But we are unable to make such interpretation and find such meaning from the previous testimony. Taking his whole testimony given at the trial, it is doubtful as to just *when* he commenced to do *anything* of a positive nature, either first thing or last thing, toward

---

6. Smith v. Siedhoff, Mo., 209 S.W.2d 233, 237; Hook v. St. Louis Public Service, Co., Mo.App., 296 S.W.2d 123, 126; Peterson v. Tiona, Mo., 292 S.W.2d 581, 584; Vietmeier v. Voss, Mo., 246 S.W. 2d 785, 789; Chenoweth v. McBurney, 359 Mo. 890, 224 S.W.2d 114, 117; East v. McMenamy, Mo., 266 S.W.2d 728, 732; Fenneren v. Smith, Mo., 316 S.W.2d 602,

607; Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495.

7. Harrellson v. Barks, Mo.App., 326 S.W. 2d 351(6) and cases cited.

8. Tyler v. Board of Education, Mo.App., 306 S.W.2d 601, 604; Miller v. Multiplex Faucet Co., Mo., 315 S.W.2d 224.

avoidance of the collision. We think that it is somewhat speculative as to whether Ellis commenced blinking his lights at a time and place which would have warned Hampton to dim his lights in time to allow Ellis to turn aside and escape the collision.[9]

 But assuming the doubtful proposition that the jury could have inferred (a) Hampton should have known Ellis was blinded and (b) this constructive knowledge came to Hampton when there was yet time for him to dim and thereafter for Ellis to pull his rig to his own side of the road, we are of the opinion that the instruction was erroneous for not hypothesizing the fact that Hampton knew or should have known that Ellis was blinded. It is true that the instruction hypothesizes that Hampton knew Ellis was in peril. But *the very essence of this claim is knowledge of blindness,* for if Hampton did not (at least constructively) know of such blindness he is not to be charged. A verdict-directing instruction must require the finding of all disputed or unconceded facts which are essential to make the plaintiff's case, and it can neither ignore nor assume the existence of any such fact. Hicks v. De Luxe Cab Co., Mo.App., 189 S.W.2d 152, 156; Rayburn v. Fricke, Mo.App., 243 S.W.2d 768; Fitzpatrick v. St. Louis-San Francisco Railway Co., Mo., 300 S.W.2d 490; Dahlen v. Wright, Mo., 235 S.W.2d 366; Politte v. Miller, Mo.App., 301 S.W. 2d 839; Terrell v. Missouri-Kansas-Texas Railroad Co., Mo., 303 S.W.2d 641; Kendrick v. Kansas City, Mo., 237 S.W. 1011; see George v. Allen, 362 Mo. 971, 245 S.W. 2d 848.

 It is true that in many cases the factual situation is such that the mere existence of the peril itself suggests both the cause and the remedy. The peril in such cases usually arises out of position or manner of operation which is apparent. In some cases it has been held that the causes of the peril are but subsidiary evidentiary facts.[10] And there are cases where the finding upon the facts submitted necessarily carries with it (implies?) a finding on the controverted issues.[11] And where the acts themselves are simple but the statement of them makes much complication, a general statement suffices and a detailed hypothesis is not necessary for jury understanding.[12] When and under what circumstances specific findings of evidentiary facts are an essential part of plaintiff's verdict-directing instruction must be determined upon the particular facts and circumstances of each case. Creech v. Riss & Co., Mo., 285 S.W.2d 554; Levin v. Caldwell, Mo., 285 S.W.2d 655. The purpose of a verdict-directing instruction is to make clear to the jury the essential fact issues it must decide. Shafer v. Southwestern Bell Telephone Co., Mo., 295 S.W.2d 109, 116. And the extent of hypothesization of the particular facts must be determined in each individual case, depending upon the real issue. See Welch v. McNeely, Mo., 269 S.W.2d 871, 877.

We think that, under the peculiar factual situation here involved, an instruction which required Hampton simply to have knowledge that Ellis was in (general?) peril (practically a conceded fact), without requiring that they find he knew or should have known Ellis was blinded, was grossly misleading and in some respects amounted almost to a directed verdict. A jury could well have believed that Ellis was blinded and in peril because he was on the wrong side of the road, yet that Hampton

9. See Farmer v. Taylor, Mo.App., 301 S.W. 2d 429(7).

10. See supra.

11. Kilo v. Howe, Mo., 257 S.W.2d 640; Dickerson v. St. Louis Public Service Co., 365 Mo. 738, 286 S.W.2d 820; Litt v.

Allen, Mo.App., 313 S.W.2d 183; Scott v. Terminal Railroad Ass'n of St. Louis, Mo.App., 86 S.W.2d 116.

12. Dooley v. Dooley, Mo.App., 290 S.W.2d 856; Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914, 917; Herrman v. Daffin, Mo.App., 302 S.W.2d 313.

did not know, actually or constructively, that the peril arose from the fact of his being blinded. Nevertheless under this instruction the jury were required to return a verdict for defendants. For that reason the cause must be reversed and remanded. Since the other alleged errors are not likely to arise again on new trial, we find no necessity to consider them.

STONE, P. J., and McDOWELL, J., concur.

On Motion for Rehearing

PER CURIAM.

Respondents are quite correct in certain suggestions as to the facts: The skid marks extended 145 feet back from the *trailer*, not the tractor, as we inadvertently stated. Without reviewing all the evidence in this regard, we agree that the jury could have found that Hampton did *not* honk his horn. Hampton *was* an experienced truck driver, had worked under the Missouri Public Service Commission rules and was familiar with the Missouri Bus and Truck Law. Defendants *did* produce a witness who testified as an expert that lights on high beam in a fog will blind an approaching driver.

But we think these facts, not stated in the principal opinion, do not cure or justify what we have determined to be error in omitting the essential fact of knowledge, actual or constructive, that Raines was blinded. In examining this instruction we have not considered whether it improperly assumes that Hampton's lights were on high beam (sharply disputed) because of our desire to hold to the fire the feet of the question on omission. It is our view that in a *humanitarian* case the defendant should not be condemned for not doing one certain or specific thing necessary to the removal of peril unless he knows, or should know, of the existence of facts which create the necessity for doing that certain thing. The very situation will often carry with it and imply the inescapable knowledge of the existence of the necessity, but we think that is not true under the peculiar circumstances of this case. Since this knowledge was an essential element, we think the burden of supplying its hypothesization by "clarification and amplification" could not be shifted to the one who is charged with humanitarian negligence.

The motion for rehearing and the motion to transfer are overruled.